UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                    )
**LIBRE BY NEXUS,**                 )
                                    )
    **Plaintiff,**             )
                                    )
        **v.**           )    Case No. 17-cv-01460 (APM)
                                    )
**BUZZFEED, INC., et al.,**         )
                                    )
    **Defendants.**           )
_____ )

## MEMORANDUM OPINION AND ORDER

**I.    INTRODUCTION**

    This case arises out of the publication of a BuzzFeed News article about Plaintiff Libre by Nexus and an alleged federal law enforcement investigation into its business practices. In response to the article, Plaintiff filed this defamation action against BuzzFeed, Inc. ("BuzzFeed"), and its editor-in-chief, Ben Smith (collectively "Defendants"). Defendants now move to dismiss Plaintiff's complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) and the District of Columbia Anti-Strategic Lawsuits Against Public Participation ("Anti-SLAPP") Act of 2010, D.C. Code §§ 16-5501 *et seq.* For the reasons stated below, the court grants in part and denies in part Defendants' Rule 12(b)(6) motion and denies Defendants' special motion to dismiss under the D.C. Anti-SLAPP Act.

**II.    BACKGROUND**

    **A.    Factual Background**

    Plaintiff Libre by Nexus is a Virginia-based company that helps immigrant detainees nationwide to secure bail bonds. Am. Compl., ECF No. 2, ¶¶ 3, 8. Plaintiff provides such services

by acting as a middleman between immigrant detainees and bail bond companies. *See id.* ¶ 8. Plaintiff contracts with bail bond companies who actually post the immigration bonds, and Plaintiff, in turn, secures the immigrations bonds through indemnifying bonds and by using GPS technology to monitor released immigrant-detainees. *Id.* A released detainee does not have to pay the full amount of the bond, nor is the detainee required to pay collateral or use his own property as security. *See id.* According to Plaintiff, its "immigration bond initiative . . . has reunited thousands of families." *Id.*

On July 23, 2016, BuzzFeed published an online article ("the Article") titled "Immigrants Desperate To Get Out Of U.S. Detention Can Get Trapped By Debt" about Plaintiff and its business practices. *Id.* ¶ 9. The Article begins with an interview of an immigrant detainee who expresses gratitude to Plaintiff for securing his release, but laments the financial burden imposed by one of the release conditions, specifically, a monthly fee of $420 he must pay to Plaintiff for the GPS monitoring. *See* Defs.' Mot. to Dismiss, ECF No. 6 [hereinafter Defs.' Mot.], Decl. of Chad R. Bowman, Ex. A, ECF No. 6-2 [hereinafter Article], at 1–2. The Article then goes on to quote immigrant advocates who criticize Plaintiff's business model. According to the advocates, because of the prolonged period between release and a final hearing in court, some released detainees end up paying more than the immigration bond itself, leaving them with a heavy financial burden. *Id.* at 2–3.

The Article then details Plaintiff's business model. It explains that Plaintiff's "customers" sign a contract agreeing to pay a nonrefundable $620 initial fee, a one-time 20 percent premium to the bond issuer, and a $420 monthly rental fee for the GPS tracking equipment. *Id.* at 3. Upon release, if the customer can pay 80 percent of the bond and agrees to cover the remaining 20 percent in installments, Plaintiff will remove the GPS tracking device. *Id.* Because many immigrant

2

detainees do not have the assets or resources to pay 80 percent of the bond, even after release, the monthly fee quickly accrues and can become a heavy financial burden. *Id.* at 3–4. As an example, the Article cites and quotes from court papers in a case filed in Los Angeles, in which a released detainee claims that he paid $1,390 more than his original bond. *Id.* at 4.

The Article is not one-sided, however. BuzzFeed interviewed for the Article Plaintiff's President, Michael Donovan, who rebuffed the notion that he runs a predatory business. *Id.* As reflected in the Article, Donovan pointed out that detained immigrants would have few options to secure release without Plaintiff's service. *Id.* He also noted that Plaintiff repays all monies paid toward the collateral, if any, upon resolution of a detainee's case, and only 2 percent of customers fail to appear in court. *Id.*

The Article then goes on to report that federal and state officials have made inquiries into Plaintiff's business practices. *See id.* at 5. It states that in 2015, U.S. Representative Norma Torres "sent a letter to ICE requesting an investigation into [Plaintiff's] business practices and 'possible exploitation' of its clients." *Id.* at 1, 5. The Article then notes—critically, for purposes of this action—that Plaintiff "had already been investigated in 2013 by the commonwealth attorney for the State of Virginia, the Fairfax City Police Department," and, as most relevant here, by "ICE's [U.S. Immigration and Customs Enforcement ('ICE')] Homeland Security Investigation (HSI) unit for allegedly targeting undocumented immigrants in custody and fraudulently charging them a fee for services." *Id.* at 5; *see* Am. Compl. ¶ 9. According to the Article, "[i]n internal ICE emails, deportation officers also expressed concerns about some of [Plaintiff's] business model and practices." Article at 5. "The investigations, however, were eventually closed due to lack of evidence." *Id.*; *see* Am. Compl. ¶ 9. The Article also notes that Donovan has had his own criminal troubles, having been convicted for passing bad checks when he was 19. Article at 5–6. According

3

to Donovan, because he could not post bond, he sat in jail for seven months—an experience that inspired him to work in prison diversion programs. *Id.* at 6.

The Article concludes by noting that Plaintiff has become an industry leader since its founding in 2014 and by reiterating both criticism and approval of Plaintiff's business model. The Article reports that, although Plaintiff donates 60 to 70 percent of its profits to its charitable arm, which provides pro bono legal services in immigration court, critics worry that this arrangement incentivizes the pro bono attorneys to drag out proceedings to "squeeze" more rental income from customers. *Id.* Donovan denied such conflict of interest. *Id.* The Article ends with quotes from a detainee who expresses his gratitude to Plaintiff for allowing him to reunite with his family. *See id.* at 7.

### B. Procedural History

Plaintiff filed this single-count defamation action against Defendants on July 22, 2017, *see* Compl., ECF No. 1, and amended its complaint the next day, *see* Am. Compl. In its Amended Complaint, Plaintiff alleges that the Article is "full of false and defamatory statements concerning [Plaintiff] and its business practices." Am. Compl. ¶ 9; *accord id.* ¶ 1. Yet, Plaintiff identifies only one statement from the Article as false and defamatory: "'ICE's Homeland Security Investigations (HSI) unit [investigated Plaintiff] for allegedly targeting undocumented immigrants in custody and fraudulently charging them a fee for services,'" but "the investigation was 'eventually closed due to lack of evidence.'" Am. Compl. ¶ 9; *see id.* ¶¶ 1, 10, 13; *see also id.* ¶ 17 ("The *statement* that [Plaintiff] was under investigation for what amounts to fraud, and/or criminal conduct, in the practice of its business is of such a type and nature to tend to prejudice [it] in the eyes of clients, . . . business partners, bond brokers[] . . . [and] sureties, . . . and members of its community in general." (emphasis added)). Plaintiff avers that at the time the Article was

4

published, Defendants had "full knowledge" of a letter from ICE to U.S. Representative Torres, dated November 15, 2015 ("November 2015 Letter"), which Plaintiff characterizes as having "addressed and disposed of any question regarding a so-called 'HSI investigation,'" "establishe[d] beyond any reasonable doubt that [Plaintiff] was not under investigation by ICE," and "practically endorsed [Plaintiff's] business model." *Id.* ¶ 10. Plaintiff then offers what appears to be a single quote from the November 2015 Letter: "ICE has no legal authority to investigate or prosecute bail bond companies or other related service providers regarding allegations of inappropriate conduct between two private parties such as an indemnitor and bond company." *Id.* Plaintiff did not attach the November 2015 Letter to its pleading.

On October 13, 2017, Defendants moved to dismiss Plaintiff's Amended Complaint with prejudice for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure. *See* Defs.' Mot. Defendants contend that Plaintiff fails to allege facts that plausibly establish that the challenged statement was false, capable of defamatory meaning, or even published with the requisite intent (in this case, actual malice). *See id.* at 1–3. Alternatively, Defendants argue that because the Article links to and accurately describes a governmental record, the "fair report privilege" forecloses Plaintiff's defamation claim. *Id.* at 1.

In addition to their Rule 12(b)(6) motion, Defendants also filed a "Special Motion to Dismiss" pursuant to the District of Columbia Anti-SLAPP Act, D.C. Code § 16-5502(a). *See* Defs.' Special Mot. to Dismiss, ECF No. 7 [hereinafter Defs.' Special Mot.]. In that motion, Defendants submit that the Amended Complaint must be dismissed with prejudice under the D.C. Anti-SLAPP Act because the Article constitutes "an act in furtherance of the right of advocacy on issues of public interest," D.C. Code § 16-5502(b), and, for the same reasons articulated in Defendants' 12(b)(6) motion, Plaintiff cannot demonstrate that its defamation claim

5

is "likely to succeed on the merits," *id. See* Defs.' Special Mot. at 4. Defendants seek, under the D.C. Anti-SLAPP Act, dismissal of this action with prejudice and an award of reasonable attorneys' fees and costs. *Id.* at 12; *see also* D.C. Code § 16-5502(d); *id.* § 16-5504.

### III. LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of a complaint. *Sickle v. Torres Advanced Enter. Sols.*, *LLC*, 884 F.3d 338, 344 (D.C. Cir. 2018). "To survive a motion to dismiss, a complaint must contain sufficient factual matter . . . to state a claim to relief that is plausible on its face." *Id.* at 344–45 (alteration in original) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

When evaluating a motion under Rule 12(b)(6), the court must "accept the plaintiff's factual allegations as true," *Sickle*, 884 F.3d at 345, and "construe the complaint in favor of the plaintiff, who must be granted the benefit of all inferences that can be derived from the facts alleged," *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012) (internal quotation marks omitted). The court need not accept as true, however, "a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Accordingly, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

In determining whether a complaint fails to state a claim under Rule 12(b)(6), a court "may consider only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which [the court] may take judicial notice." *Trudeau v. FTC*, 456 F.3d 178, 183 (D.C. Cir. 2006) (quoting *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621,

624–25 (D.C. Cir. 1997)). As relevant here, "[a] district court may consider documents attached to a motion to dismiss, without converting the motion into a motion for summary judgment, if those documents' authenticity is not disputed, they were referenced in the complaint, and they are 'integral' to one or more of the plaintiff's claims." *See Scott v. J.P. Morgan Chase & Co.*, No. 17-cv-249, 2017 WL 4990519, at *4 (D.D.C. Oct. 30, 2017) (citing *Kaempe v. Myers*, 367 F.3d 958, 965 (D.C. Cir. 2004); and *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1133 (D.C. Cir. 2015)).

In this case, the Article is clearly integral to Plaintiff's defamation claim. Thus, unsurprisingly, Plaintiff makes explicit reference to the Article throughout its Amended Complaint, even though it does not attach the Article as an exhibit. *See generally* Am. Compl. Defendants, however, do attach the Article to their motion, *see* Defs.' Mot. at 3 & n.2, and Plaintiff also not contest its authenticity, *see* Pl.'s Consolidated Opp'n to Defs.' Mot. to Dismiss & Special Mot. to Dismiss, ECF No. 13 [hereinafter Pl.'s Opp'n]. Thus, the court may consider the Article without converting Defendants' motion into a motion for summary judgment. *See Scott*, 2017 WL 4990519, at *4; *see also Marsh v. Hollander*, 339 F. Supp. 2d 1, 5 n.4 (D.D.C. 2004) (applying rule in defamation suit).

Importantly, however, the court does not read the Amended Complaint to incorporate the Article wholesale. For example, by referring to the Article in its complaint, Plaintiff, of course, does not purport to adopt the factual contents of the Article as true, thereby defeating its defamation claim. *See Banneker Ventures*, 798 F.3d at 1133 (explaining that it may not always be appropriate for a court "to treat [an] *entire* document as incorporated into the complaint," and, by way of example, noting that "a libel plaintiff who attaches to her complaint the allegedly libelous writing

7

does not adopt the libelous statement as *true*, thereby defeating her own claim" (emphases added) (citing *Gant v. Wallingford Bd. of Educ.*, 69 F.3d 669, 674 (2d Cir. 1995))).

IV. **DISCUSSION**

    A. **The Rule 12(b)(6) Motion**

        *1. General Principles*

The court begins by determining whether Plaintiff's defamation claim is subject to dismissal under Rule 12(b)(6). To state a claim for defamation under District of Columbia law,[1] a plaintiff must allege sufficient facts to establish:

> (1) that the defendant made a false and defamatory statement concerning the plaintiff; (2) that the defendant published the statement without privilege to a third party; (3) that the defendant's fault in publishing the statement amounted to at least negligence; and (4) either that the statement was actionable as a matter of law irrespective of special harm or that its publication caused the plaintiff special harm.

*Deripaska v. Associated Press*, 282 F. Supp. 3d 133, 140–41 (D.D.C. 2017) (quoting *Solers, Inc. v. Doe*, 977 A.2d 941, 948 (D.C. 2009)).

In this case, Defendants contend that Plaintiff fails to allege facts that make out a plausible claim of defamation. The court agrees. The court finds that the Amended Complaint, as currently pleaded, does not contain factual allegations that give rise to a plausible inference that the challenged statement in the Article is *false*. Accordingly, the court need not reach Defendants' other arguments in order to conclude that Plaintiff fails to state a claim of defamation under District of Columbia law.

---

[1] Both parties appear to agree that District of Columbia law applies to Plaintiff's defamation claim in this diversity action. *See* Defs.' Mot.; Pl.'s Opp'n. Thus, the court will apply District of Columbia law here. *See Vasquez v. Whole Foods Market, Inc.*, No. 17-cv-112, 2018 WL 810232, at *16 n.11 (D.D.C. Feb. 9, 2018); *cf. Abbas v. Foreign Policy Grp., LLC*, 783 F.3d 1328, 1338 n.6 (D.C. Cir. 2015) (concluding that D.C. defamation law governed the dispute where the plaintiff alleged the conduct causing his injury took place in the District of Columbia, the defendants agreed that D.C. law should govern, and the parties relied upon D.C. law in briefing their appeal).

Before turning to the sufficiency of the allegations in the complaint with respect to falsity, however, a few general principles should be established. First, while there is no heightened pleading standard for defamation, *see Croixland Props. Ltd. P'ship v. Corcoran*, 174 F.3d 213, 215 n.2 (D.C. Cir. 1999), courts in this District have routinely held that a plaintiff must generally allege the content of the purportedly defamatory matter, *see Mattiaccio v. DHA Grp., Inc.*, 908 F. Supp. 2d 136, 138 (D.D.C. 2012); *see, e.g.*, *Stovell v. James*, 810 F. Supp. 2d 237, 248 (D.D.C. 2011) (holding that the plaintiff failed to adequately plead his defamation claim where he "failed to identify any of the specific statements" he alleged were defamatory); *cf. Iqbal*, 556 U.S. at 678.

Second, falsity and defamatory meaning "are distinct elements of the tort of defamation and are considered separately." *Zimmerman v. Al Jazeera Am., LLC*, 246 F. Supp. 3d 257, 273 (D.D.C. 2017) (quoting *White v. Fraternal Order of Police*, 909 F.2d 512, 520 (D.C. Cir. 1990)); *see Rosen v. Am. Israel Pub. Affairs Comm., Inc.*, 41 A.3d 1250, 1256 (D.C. 2012). Thus, when confronted with a motion to dismiss a defamation claim, a court must determine not only whether a statement is capable of defamatory meaning but also whether the statement is plausibly false. *Zimmerman*, 246 F. Supp. 3d at 278 n.13 (noting that the court would assume that the plaintiffs "sufficiently alleged the falsity of the accusations on the face of the complaint" because the defendants did not appear to argue "that the complaint [was] insufficient with respect to its allegations of falsity"); *cf. Oparaugo v. Watts*, 884 A.2d 63, 77 (D.C. 2005) (noting that the defendants "made no serious challenge to the sufficiency of the allegations with respect to the element[] of *falsity*" (emphasis added)).

Third, and relatedly, while the question "whether a statement is capable of defamatory meaning" is indisputably a "threshold question of law," *see, e.g.*, *Zimmerman*, 246 F. Supp. 3d at 273 (alterations and internal quotation marks omitted), falsity, under some circumstances, may

9

also be decided as a matter of law, *see Trudeau*, 456 F.3d at 194 (citing *Moldea v. New York Times Co.*, 15 F.3d 1137 (D.C. Cir.), *rev'd in part on other grounds*, 22 F.3d 310 (D.C. Cir. 1994)); *see also Smith v. Clinton*, 253 F. Supp. 3d 222, 239 (D.D.C. 2017) ("A court must also determine the threshold question of law of whether the statement is false.").[2] Although not a defamation case per se, the D.C. Circuit's decision in *Trudeau* is illustrative. There, the plaintiff brought a claim against the Federal Trade Commission, alleging that the agency had infringed upon his First Amendment rights and committed statutory violations by issuing a press release containing false statements about a settlement he had reached with the agency. The court identified as the "essential element common to both of Trudeau's claims" the allegation that "the FTC's press release is false or misleading." *Trudeau*, 456 F.3d at 191. As relevant here, the Circuit rejected Trudeau's assertion that the falsity of the press release was a question of fact that could not be decided on a motion to dismiss, and adopted as the applicable standard for the threshold determination of falsity whether any reasonable person could find the statement to be false. *Id.* at 193–94.[3] The court then

---

[2] The court recognizes that the D.C. Circuit has, on at least two occasions, stated that "in reviewing the dismissal of the complaint," a court "'must assume, as the complaint alleges, the falsity of any . . . factual statements made' in the publications at issue" and that the defendant "made such statements with the requisite state of mind." *Farah v. Esquire Magazine*, 736 F.3d 528, 534 (D.C. Cir. 2013) (quoting *Weyrich v. New Republic, Inc.*, 235 F.3d 617, 623 (D.C. Cir. 2001)). The court does not, however, read those statements as requiring application of anything other than the *Twombly/Iqbal* pleading standard. In *Weyrich*, the court merely cited to the plaintiff's complaint in support of the aforementioned proposition and, in any event, the court was operating under a pre-*Twombly/Iqbal* pleading standard. *See Weyrich*, 235 F.3d at 623 (citing *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), which relied upon the disavowed Rule 12(b)(6) formulation of *Conley v. Gibson*, 355 U.S. 41, 45–46 (1957)). Moreover, while *Farah* was decided after the Supreme Court's decisions in *Twombly* and *Iqbal*, the D.C. Circuit did not explain how, if at all, those cases affect the rule recited in *Weyrich*. *See Farah*, 736 F.3d at 533–34. Thus, despite the "seemingly broad pronouncement" in *Farah*, courts in this District still grant motions to dismiss where the facts alleged do not make out a plausible defamation claim. *Cf. Deripaska*, 282 F. Supp. 3d at 143 (citing cases in which courts have dismissed in part because of "the failure of a public figure to plausibly allege facts that support an inference of actual malice in a defamation case"). Perhaps for this reason, Plaintiff does not appear to dispute the need to allege facts that plausibly establish that the statement in the Article was false. *See* Pl.'s Opp'n at 7.

[3] Notably, in adopting this standard and rejecting Trudeau's assertion that "the truth or falsity of a statement can never be decided as a matter of law," *id.* at 193, the D.C. Circuit relied in part on its decision in *Moldea*, in which the district court granted "summary judgment to a *defamation* defendant on the pleadings and without discovery," and the Circuit, at least with respect to two of the defamatory statements, agreed with the district court's conclusion that the statements "were not actionable as a matter of law because 'no reasonable juror could find them to be false.'" *Trudeau*, 456 F.3d at 193–94 (emphasis added) (citing *Moldea*, 15 F.3d at 1139, 1148–49).

10

proceeded to evaluate each allegedly false statement in the press release under that standard. *See id.* at 194–97. The court follows the approach taken in *Trudeau* here. The court therefore must determine whether Plaintiff has alleged sufficient facts to plausibly establish that the allegedly defamatory statement is false.

### 2. *The Article's Alleged False Statement*

With these general principles in mind, the court turns to the factual allegations in the Amended Complaint. Plaintiff advances a precise theory of defamation in its pleading. It identifies only a single false and defamatory statement in the Article: that Plaintiff was investigated by ICE in 2013 for "'targeting undocumented immigrants in custody and fraudulently charging them a fee for services.'" Am. Compl. ¶¶ 1, 9, 13; *see id.* ¶¶ 2, 15, 17; *cf.* Pl.'s Opp'n at 7–8. Plaintiff also offers a specific explanation for why Defendants knew that the statement was false when made. Plaintiff points to an excerpt from the November 2015 Letter from ICE to U.S. Representative Torres, which Plaintiff claims Defendants possessed before publishing the Article, which reads: "ICE has no legal authority to investigate or prosecute bail bond companies or other related service providers regarding allegations of inappropriate conduct between two private parties such as an indemnitor and bond company." Am. Compl. ¶ 10; *see* Pl.'s Opp'n at 2, 7–8. According to Plaintiff, the November 2015 Letter alone establishes that Plaintiff "was not under investigation in 2013, as falsely represented by BuzzFeed." Pl.'s Opp'n at 7.

In its degree of precision, Plaintiff's Amended Complaint is much like the complaint the D.C. Circuit considered in *Trudeau*. There, the court observed that "Trudeau's complaint makes quite clear which text he regards as false (specified sentences in the press release), and why he regards it as false (because of specified inconsistencies with the [settlement agreement])." *Trudeau*, 456 F.3d at 193. The same is true here. Plaintiff's Amended Complaint "makes quite

11

clear which text [it] regards as false" (the Article's allegation that ICE investigated Plaintiff in 2013 for allegedly targeting immigrant detainees and fraudulently charging them a fee for services), "and why [it] regards [that text] as false" (because of its inconsistency with the specified quote from the November 2015 Letter). Thus, much as the Circuit did in *Trudeau*, the court evaluates whether Plaintiff's specific theory of defamation is plausible in light of the complaint's allegations and, importantly, the Article itself.[4]

The court finds that it is not. To begin, contrary to what Plaintiff claims, there is no material inconsistency between the alleged defamatory statement contained in the Article and the above-quoted excerpt from the November 2015 Letter. In the November 2015 Letter, ICE represented that it lacked the "legal authority to investigate" businesses like Plaintiff "regarding allegations of inappropriate conduct between *two private parties* such as an indemnitor and bond company." Am. Compl. ¶ 10 (emphasis added). Thus, the focus of the quoted portion of the November 2015 Letter pertains to ICE's absence of authority to investigate conduct between two *private* parties involved in the bail bonding business. That quote says nothing, however, about whether ICE had the power in 2013 to investigate conduct between a private bail-bonds indemnitor like Plaintiff, and *detained immigrants* under ICE custody. The Article, at least implicitly, asserts that ICE did have such power, but the quoted portion of the November 2015 Letter does not say otherwise. All it does is speak to ICE's investigatory authority with respect to conduct between private parties—not a private party's acts directed at ICE detainees. Thus, the specific theory of falsity that Plaintiff advances is not supported by the factual allegations that it makes.

And there is more. The Article contains hyperlinks to three records, each of which is meant to be respective evidence of the claims that, in 2013, Plaintiff's business practices were the subject

---

[4] Because *Trudeau* was decided pre-*Twombly*, the court actually applied the less stringent standard from *Conley*. *See id.*

12

of investigation by "the commonwealth attorney for the State of Virginia," "the Fairfax City Police Department," and "ICE's Homeland Security Investigations (HSI) unit." Article at 5. Plaintiff challenges the authenticity of the document hyperlinked as evidence that ICE investigated Plaintiff in 2013 but closed the investigation for lack of evidence. The court therefore does not consider that record. *See Scott*, 2017 WL 4990519, at *4 (explaining that a court may consider a document to be incorporated in the complaint by reference if, among other things, its authenticity is not disputed). But Plaintiff does not contest the authenticity of the other two hyperlinked records, which concern purported investigations by "the commonwealth attorney for the State of Virginia" and "the Fairfax City Police Department," and both of which appear in the very same sentence in the Article as the challenged statement concerning the ICE investigation. Article at 5. These records appear to come from ICE's files circa 2013. One record, referencing the date "10/21/2013," bears an "ICE" Bates stamp number and exemption markings (e.g., "(b)(6), (b)(7)(C)") consistent with withholdings under the Freedom of Information Act. *Id.* (linking to "commonwealth attorney" record). The other record, referencing the date "10/30/2013," likewise contains redactions consistent with FOIA withholdings. *Id.* (linking to "Fairfax City Police Department" record). The court, at this stage, need not conclusively determine that these hyperlinked records in fact come from ICE's files circa 2013. It is sufficient at this juncture to observe that the records—again, whose authenticity Plaintiff does not dispute—make less plausible Plaintiff's allegation that ICE did not conduct at least *some* kind of an investigation into Plaintiff's business practices in 2013, even if it did no more than gather investigative records from local law enforcement.[5]

---

[5] The Article also cites, as the basis for its contention that Donovan has accumulated his own criminal history, "records from *the HSI investigation* that were obtained by BuzzFeed News under the Freedom of Information Act." Article at 5–6 (emphasis added). The Article goes on to explain that "[i]n a statement, [Plaintiff] said that the HSI documents misrepresented Donovan's record . . . ." *Id.* at 6. Plaintiff does not directly challenge this portion of the Article in its

13

Finally, Plaintiff's failure to attach the November 2015 Letter to the Amended Complaint, or at least further quote from it, leaves the factual predicate for Plaintiff's defamation claim wanting here. *Cf. Alston v. Johnson*, 208 F. Supp. 3d 293, 298 (D.D.C. 2016) (observing that a legally deficient claim ought not to survive a motion to dismiss simply because the plaintiff did not attach a dispositive document on which it relies). The Article quotes from, and links to, an October 16, 2015 letter from U.S. Representative Norma J. Torres to ICE, which lists a series of questions for the agency concerning "possible exploitation" of immigrant detainees by Plaintiff. *See* Article at 5; *see id.* (linking to "letter"). The very first question the Representative asks is, "Is ICE aware of the practices employed by Libre By Nexus? If so, when did ICE learn of this activity?" *Id.* The court does not know whether the November 2015 Letter referenced in Plaintiff's complaint is a direct response to the October 16, 2015 letter from Representative Torres. It may be. If so, the November 2015 Letter presumably would shed substantial light on whether ICE in fact investigated Plaintiff in 2013. Plaintiff's failure to attach such a critical record to its Amended Complaint, when combined with the deficiencies in his pleading discussed above, therefore leaves further questions about the plausibility of Plaintiff's defamation claim. For these reasons, the court finds the Amended Complaint fails to state a claim under Rule 12(b)(6). *Cf. Liberty Lobby, Inc. v. Dow Jones & Co., Inc.*, 838 F.2d 1287, 1292 (D.C. Cir. 1988) (holding, albeit in summary judgment context, that "[w]here the question of truth or falsity is a close one, a court should err on the side of nonactionability").

Notwithstanding the foregoing conclusion, the court declines Defendants' invitation to dismiss Plaintiff's Amended Complaint *with prejudice* for failure to state a claim under Rule

---

complaint. *See* Am. Compl. While the Article does not link to a full statement from Plaintiff (to the extent there is one), the court notes that if Plaintiff failed to challenge the existence of the HSI investigation in such a statement, then that failure would serve as an additional reason to doubt the plausibility of its allegations with respect to falsity here.

14

12(b)(6). "Dismissal with prejudice is the exception, not the rule, in federal practice because it 'operates as a rejection of the plaintiff's claims on the merits and [ultimately] precludes further litigation of them.'" *Rudder v. Williams*, 666 F.3d 790, 794 (D.C. Cir. 2012) (alteration in original) (quoting *Belizan v. Hershon*, 434 F.3d 579, 583 (D.C. Cir. 2006)). Accordingly, the court will allow Plaintiff an opportunity to re-plead. *See Vasaturo v. Peterka*, 177 F. Supp. 3d 509, 512 (D.D.C. 2016) (dismissing without prejudice and allowing plaintiff to re-plead his claims, even though the court had "grave doubts" about the factual legitimacy of the complaint); *see also infra* (denying Defendants' special motion to dismiss under the D.C. Anti-SLAPP Act).

## B. The D.C. Anti-SLAPP Act Motion

That leaves Defendants' Special Motion to Dismiss under the D.C. Anti-SLAPP Act. Generally speaking, the D.C. Anti-SLAPP Act "requires courts, upon motion by the defendant, to dismiss defamation lawsuits that target . . . public advocacy," *Abbas v. Foreign Policy Grp.*, 783 F.3d 1328, 1331 (D.C. Cir. 2015); *see* D.C. Code § 16-5502(a), unless the plaintiff can "demonstrate[] that the claim is likely to succeed on the merits," *id.* § 16-5502(b). This case, however, presents a threshold question: whether a federal court exercising diversity jurisdiction may even apply the D.C. Anti-SLAPP Act's special motion to dismiss provision in the first instance. *See generally* Defs.' Special Mot. at 1–2, 4–7; Pl.'s Opp'n at 8–9. The D.C. Circuit has ruled that "[t]he answer is no," *see Abbas*, 783 F.3d at 1333, but Defendants submit that the Circuit reached this conclusion by relying on a prediction of District of Columbia law that "has since been proven wrong" by the D.C. Court of Appeals' decision in *Competitive Enterprise Institute v. Mann*, 150 A.3d 1213 (D.C. 2016). *See* Defs.' Special Mot. at 5. "The result of *Mann*," Defendants contend, is that "*Abbas* no longer forecloses application of the D.C. Anti-SLAPP Act in diversity cases." *Id.* at 6.

15

The D.C. Circuit has never "squarely addressed" the issue whether a court is bound by the D.C. Circuit's interpretation of District of Columbia law or should instead follow a subsequent and conflicting decision by the D.C. Court of Appeals. *Deripaska v. Associated Press*, No. 17-cv-913, 2017 WL 8896059, at *1 (D.D.C. Oct. 17, 2017) (quoting *Easaw v. Newport*, 253 F. Supp. 3d 22, 34 (D.D.C. 2017)). Nevertheless, several courts in this District have held that, "'when faced with conflicting authority on D.C. law,' if the D.C. Court of Appeals 'has spoken clearly and unmistakably as to the current state of D.C. law,' the district court should defer to that interpretation." *Id.* (quoting *Easaw*, 253 F. Supp. 3d at 34).

The question before this court then is whether *Mann* "clearly and unmistakably" interprets the D.C. Anti-SLAPP Act in a way that renders the holding in *Abbas* "inaccurate." *See Easaw*, 253 F. Supp. 3d at 35. In this court's view, *Mann* does not.

In *Abbas*, the D.C. Circuit held that a federal court exercising diversity jurisdiction must apply Federal Rules of Civil Procedure 12 and 56, instead of the D.C. Anti-SLAPP Act's special motion to dismiss provision, because they "answer the same question." 783 F.3d at 1337. The court explained that "[f]or the category of cases that it covers," the Act "establishes the circumstances under which a court must dismiss a plaintiff's claim before trial—namely, when the court concludes that the plaintiff does not have a likelihood of success on the merits." *Id*. at 1333. The Federal Rules of Civil Procedure do not, however, require such showing to avoid dismissal before trial. *Id.* at 1333–34. And "[t]hat difference matters." *Id.* at 1334. "Under the Federal Rules, a plaintiff is generally entitled to trial if he or she meets the Rules 12 and 56 standards to overcome a motion to dismiss or for summary judgment." *Id.* For example, "under Federal Rule 12(b)(6), a plaintiff can overcome a motion to dismiss by simply alleging facts sufficient to state

16

a claim that is plausible on its face." *Id.* "But the D.C. Anti-SLAPP Act nullifies that entitlement in certain cases":

> Under the D.C. Anti–SLAPP Act, the plaintiff is *not* able to get to trial just by meeting those Rules 12 and 56 standards. The D.C. Anti–SLAPP Act, in other words, conflicts with the Federal Rules by setting up an additional hurdle a plaintiff must jump over to get to trial.

*Id.* In short, the court held, "unlike the D.C. Anti-SLAPP Act, the Federal Rules do not require a plaintiff to show a likelihood of success on the merits in order to avoid pre-trial dismissal." *Id.*; *see also id.* at 1335 (noting that the Act's likelihood of success standard "is different from and more difficult for plaintiffs to meet than the standards imposed by Federal Rules 12 and 56").

*Mann* presented the D.C. Court of Appeals with its first opportunity to interpret the D.C. Anti-SLAPP Act's special motion to dismiss standard, i.e., the requirement that a plaintiff "demonstrate[] that the claim is likely to succeed on the merits," D.C. Code § 16-5502(b). *See Mann*, 150 A.3d at 1220. In *Mann*, the court first noted that "the word 'demonstrate' indicates that once the burden has shifted to the [plaintiff]" after a prima facie showing by the defendant that the claim "aris[es] from an act in furtherance of the right of advocacy on issues of public interest," D.C. Code § 16-5502(a), "the statute requires more than mere reliance on allegations in the complaint, and mandates the production or proffer of evidence that supports the claim." *Mann*, 150 A.3d at 1232–33. Next, the court defined "likely to succeed" to mean "whether a jury properly instructed on the applicable legal and constitutional standards could reasonably find that the claim is supported in light of the evidence that has been produced or proffered in connection with the motion." *Id.* at 1232; *see id.* at 1236. The application of this standard should result in dismissal, the court explained, "only if the court can conclude that the [plaintiff] could not prevail *as a matter of law*, that is, after allowing for the weighing of evidence and permissible inferences by the jury."

17

*Id.* at 1236. In announcing this standard, the D.C. Court of Appeals also expressed some disagreement with the D.C. Circuit's interpretation in *Abbas* and explained that the Act's likelihood of success standard does, in fact, "simply mirror the standards imposed by Federal Rule 56." *Id.* at 1238 n.32 (internal quotation mark omitted).

Notwithstanding *Mann*'s clarification of the D.C. Anti-SLAPP Act standard, *Mann* does not "clearly and unmistakably" compel the court to deviate from the Circuit's holding in *Abbas*. The two motion-to-dismiss standards are fundamentally at odds. First, under the D.C. Anti-SLAPP Act, a plaintiff must produce or proffer evidence to survive a special motion to dismiss. *Id.* at 1233. On the other hand, a plaintiff need only plead facts establishing a "plausible" defamation claim to survive a motion to dismiss under Rule 12(b)(6). *See Abbas*, 783 F.3d at 1334. The court in *Mann* expressly recognized this difference. *See* 150 A.3d at 1233 ("[U]nless something more than argument based on the allegations in the complaint is required, the special motion to dismiss created by the Act would be redundant in light of the general availability, in all civil proceedings . . . of motions to dismiss under Rule 12(b)(6).").

Second, Rule 12 and the D.C. Anti-SLAPP Act differ in terms of the allocation of the burden among the parties:

> [T]he Act reverses "the allocation of burdens for dismissal of a complaint under" Rule 12(b)(6), giving defendants "the option to up the ante early in the litigation, by filing a special motion to dismiss that will require the plaintiff to put his evidentiary cards on the table . . . [which] makes the plaintiff liable for the defendant's costs and fees in the motion succeeds."

*Deripaska*, 2017 WL 8896059, at *2 (second and third alterations in original) (citation and footnote omitted) (quoting *Mann*, 150 A.3d at 1237–38). Such burden-shifting at the motion to dismiss is anathema to the Rule 12(b)(6) standard, which places the burden squarely on the defendant to justify dismissal. *Cf. 3M Co. v. Boulter*, 842 F. Supp. 2d 85, 102 (D.D.C. 2012)

("There is no question that the special motion to dismiss under the Anti-SLAPP Act operates greatly to a defendant's benefit by altering the procedure otherwise set forth in Rule[] 12 . . . for determining a challenge to the merits of a plaintiff's claim and by setting a higher standard *upon the plaintiff* to avoid dismissal." (emphasis added)).

In view of these differences, this court must follow *Abbas*. The court is not alone in reaching that conclusion. Recently, in *Deripaska v. Associated Press*, Judge Huvelle held that *Mann* did not "'clearly and unmistakably' resolve the question at issue here." *See* 2017 WL 8896059, at *1, *3 (dismissing the defendant's special motion to dismiss and finding that the court was still bound by the D.C. Circuit's decision in *Abbas*); *see also* Defs.' Notice of Suppl. Authorities, ECF No. 10. Finding the reasoning in *Deripaska* to be persuasive, this court declines Defendants' invitation to forge a different path.

Accordingly, like the court in *Deripaska*, this court concludes that it "must follow the clear guidance of the D.C. Circuit [in *Abbas*] and deny the special motion to dismiss." 2017 WL 8896059, at *3.

## V. CONCLUSION AND ORDER

For the foregoing reasons, Defendants' Motion to Dismiss, ECF No. 6, is granted in part and denied in part, and Defendants' Special Motion to Dismiss, ECF No. 7, is denied. The court will dismiss Plaintiff's Amended Complaint without prejudice and allow Plaintiff the opportunity to re-plead its defamation claim consistent with this opinion. Plaintiff shall file any amended complaint no later than 21 days from this date, or face a final order of dismissal.

Dated: May 16, 2018

Amit P. Mehta
United States District Judge